IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge S. Kato Crews

Civil Action No. 1:20-cv-01687-SKC

SHONTELLA YOUNG,

     Plaintiff,

v.

COLORADO JUDICIAL DEPARTMENT,
18TH JUDICIAL DISTRICT PROBATION DEPARTMENT,

     Defendant.

---

**ORDER RE: DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [DKT. 60]**

---

This Order addresses Defendant Colorado Judicial Department, 18th Judicial District Probation Department's ("Judicial") Motion for Summary Judgment ("Motion"). [Dkt. 60.] The Court has reviewed the Motion, all related briefing, the entire record, and applicable law. No hearing is necessary.[1] For the following reasons, the Motion is GRANTED.

## A. JURISDICTION

---

[1] The issues raised by and inherent to the Motion are fully briefed, obviating the necessity for any evidentiary hearing or oral argument. Thus, the Motion stands submitted on the papers. *Cf.* Fed. R. Civ. P. 56(a); *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir. 1988) (any hearing requirement for summary judgment motions is satisfied by the court's review of the briefs and supporting materials submitted by the parties).

The Court has jurisdiction over this case under 28 U.S.C. § 1331 (federal question).

## B. STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, then the nonmoving party must identify material facts showing there is a genuine dispute for trial. *Id.* at 324. A fact is "material" if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). An issue is "genuine" if a rational trier of fact could find for the nonmoving party on the evidence presented. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the nonmoving party. *Id*. A mere "scintilla of evidence," however, is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009). And

2

conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999), *cert. denied*, 528 U.S. 933 (1999); *Nutting v. RAM Southwest, Inc.*, 106 F. Supp.2d 1121, 1123 (D. Colo. 2000). Instead, a nonmovant "must proffer facts such that a reasonable jury could find in her favor." *Id*. And a nonmovant who bears the burden of persuasion at trial may not simply rest upon their pleadings; they must go beyond the pleadings and identify specific facts supported by admissible evidence in the event of trial from which a rational trier of fact could find for the nonmovant. *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1197 (10th Cir. 2000). To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein. *Id*.

The Court acknowledges Plaintiff is not an attorney. Consequently, her filings and related submissions are construed liberally and held to a less stringent standard than if drafted by an attorney. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). Despite the liberal construction afforded *pro se* pleadings, however, courts do not construct arguments or theories for a *pro se* party in the absence of any discussion of those issues. *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989), *cert. denied*, 493 U.S. 1059 (1990).

## C. BACKGROUND

This matter arises out of the demise of Plaintiff's probationary employment with Judicial. Plaintiff, an African American female, brings three claims against

Judicial under Title VII if the Civil Rights Act of 1964: (1) disparate treatment; (2) hostile work environment; and (3) retaliation. [*See* generally, Dkt. 36-2.]

As an initial matter, in accordance with Rule 56, Judicial supported its Motion with affidavits, deposition testimony, and other admissible evidence. It presented 71 discrete statements of undisputed material facts supported by competent record evidence, thereby meeting its initial burden as the moving party. [Dkt. 60-1.] Plaintiff responded to some, but not all, of Judicial's factual statements. [Dkt. 76-1.] Where she provided responses, they consisted of unsubstantiated allegations which carry no probative value on summary judgment. *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098-99 (10th Cir. 2019) (citing *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). As the nonmoving party, Plaintiff must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial which a rational trier of fact could find for the nonmovant." *Coleman v. Blue Cross Blue Shield of Kan.*, 487 F. Supp.2d 1225, 1232 (D. Kan. 2007) (internal quotations and citation omitted). Accordingly, for purposes of summary judgment, the Court deems admitted all facts which Plaintiff failed to controvert with competent evidence under Rule 56(c)(1).

### D. UNDISPUTED MATERIAL FACTS

The following facts are either uncontroverted, or if controverted, are viewed in the light most favorable to Plaintiff: On April 22, 2019, Judicial hired Plaintiff as a Support Services Assistant on a probationary period. [Dkt. 60-3, ¶4.] As an employee

of Judicial, Plaintiff was subject to the Colorado Judicial System Personnel Rules. [Dkt. 60-21, ¶4.] To become a certified employee, Plaintiff was required to score 2.76 or higher on her first annual performance appraisal. [*Id*. at ¶8.] Any probationary employee receiving a score below 2.76 on their first annual performance appraisal must be terminated. [*Id*. at ¶9.] Judicial terminated Plaintiff's probationary employment on March 19, 2020, after she failed to obtain the required 2.76 on her performance appraisal. [Dkt. 60-19, ¶10.]

When employed, Plaintiff performed administrative tasks. [Dkt. 60-2, p.23:9-13.] The tasks varied, but often included putting folders together for probation officers, answering phones, making copies, processing mail, and acting as a receptionist. [Dkt. 60-3, ¶9.] Plaintiff and other support staff rotated between two work locations – the Lima Office and the Arapahoe County Justice Center ("ACJC"). [*Id*. at ¶12.] The ACJC was the busier and larger of the two locations. [*Id*.] Karen Johnston and Kimberly Moore were the first-line supervisors for support staff and split their time between the two offices [*Id*. at ¶14.]

Ms. Moore (African American) supervised Plaintiff and her co-workers, Alexandria Lombardi and Manda Thurlow-Martinez. [*Id*. at ¶¶3 and 15.] Ms. Lombardi (African American) appears to have been hired at the same time as Plaintiff. [*Id*. at ¶38.] Ms. Johnston supervised Carol Broome, Barbara Robertson, Colette Walton, and Melantha Harris. [*Id*. at ¶15.]

1.      **Plaintiff's Training**

New support staff were expected to complete approximately 20 hours of training in three years. [*Id.* at ¶11.] Ms. Walton (African American) was the primary trainer for Plaintiff and Ms. Lombardi. [*Id.* at ¶¶38-40.] Soon after she began training Plaintiff, Ms. Walton reported having difficulties because Plaintiff "was abusive towards other co-workers, argumentative, and unwilling to accept feedback and constructive guidance" from more tenured staff members. [*Id.* at ¶40.] Ms. Moore then counseled Plaintiff on creating a negative work environment, failing to work with team members, and the importance of being "less abrasive toward team members[.]" [*Id.* at ¶41.] She also documented this conduct in Plaintiff's performance appraisal. [*Id.* at ¶42.]

Plaintiff, for her part, did not like Ms. Walton's training style, which she described as "cold" and consisting more of "telling [Plaintiff] how to do certain things." [Dkt. 60-2, p.60:23-63:4.] Plaintiff preferred Ms. Thurlow-Martinez, who also trained Plaintiff. [*Id.* at pp.61:11-63:4.] On September 6, 2019, Plaintiff filed a complaint with Janice McMullin, Human Resources Analyst and Risk Manager for the State Court Administrator's Office ("Internal Complaint"). [Dkt. 60-21, ¶6.] In her Internal Complaint, Plaintiff claimed co-worker harassment and differences in training she received as compared to Ms. Lombardi. [*See* generally, Dkt. 60-23.] Defendant investigated these allegations. [*See* generally, Dkt. 76-2, pp.35-40.]

Regarding the alleged co-worker harassment, Plaintiff claimed Ms. Walton and Barbara Robertson were harassing her. [Dkt. 60-23.] Plaintiff claimed Ms. Walton

6

created a hostile work environment because she was "cold" and short in her responses toward Plaintiff and was "catty and unprofessional." [Dkt. 60-2, pp.84:5- 85:1.] Plaintiff believed Ms. Walton was unfriendly, closed-minded, and confrontational. [*Id*. at p.85:4-85:14.] She explained that Ms. Walton would come into her office unannounced and sit in a chair next to Plaintiff's desk and ask Plaintiff what she needed, and then walk away after Plaintiff said she did not need anything. [*Id*. at pp.84:5-85:1.] Plaintiff also believed Ms. Walton talked to her in an "embarrassing tone." [*Id*. at p.87:8-87:21.] On one occasion, Ms. Walton talked to Plaintiff about what they were going to do when they came back from lunch while Plaintiff was trying to assist a customer. [*Id*.] Plaintiff believes Ms. Walton's conduct was unprofessional, intimidating, and embarrassing. [*Id*. at pp.87:8- 88:5.] Plaintiff also complained to Ms. Moore about Ms. Walton, claiming Ms. Walton displayed a "nonverbal attitude of negativity" in staff meetings.[2] [Dkt. 60-23, ¶3.]

Regarding differences in training, the investigation found that even if Plaintiff's training was moving slower than Ms. Lombardi's, it was due to their different learning styles and personality conflicts between Plaintiff and Ms. Walton. [Dkt. 60-24, ¶6; Dkt. 76-2, p.35.] The investigation also determined Plaintiff's training may have moved slower because Plaintiff spent a significant amount of time in training unrelated to her specific job duties, including 31.5 hours of off-site training

---

[2] There is no mention in the record regarding Plaintiff's specific complaints about Ms. Robertson.

in the first four months of her employment. [Dkt. 60-24, ¶6; Dkt. 76-2, p.36.] Plaintiff agrees she and Ms. Lombardi were "trained differently to do different tasks," but says "that was fine." [Dkt. 60-2, pp.75:12-76:25.] Plaintiff contends the training she received was "not incorrect, just a different way of performing a particular task."[3] [*Id.*]

### 2.    Plaintiff's Performance Issues

During her employment, Judicial determined Plaintiff struggled in the key areas of communication, personal leadership/orientation to work, professionalism, and teamwork. [Dkt. 60-3, ¶18]; [Dkt. 60-5, pp.1-7.] Ms. Moore, as Plaintiff's first-line supervisor, spoke directly with Plaintiff about these deficiencies as they arose. [Dkt. 60-3, ¶¶18-19.] She also memorialized these conversations in contemporaneous correspondence with Plaintiff and in her notes. [*Id.*]

One area of concern was Plaintiff's failure to follow the chain of command, which Ms. Moore memorialized in Plaintiff's performance appraisal. [*Id.* at ¶¶20 and 25.] Specifically, Plaintiff would seek out other supervisors rather than her direct supervisor, Ms. Moore. [*Id.* at ¶20.] Plaintiff knew Ms. Moore was her direct supervisor, and as such, was her primary contact when Ms. Moore was in the office. [*Id.* at ¶17.] Ms. Moore documented concerns as early as May 2019 regarding Plaintiff's refusal to follow the chain of command and spoke with Plaintiff numerous

---

[3] Plaintiff alleges in her Second Amended Complaint that she was trained differently than two white employees, but she cannot provide their names, what month they were hired, or how the training differed. [Dkt. 60-2, pp. 91:2- 92:23; 76:23- 82:8.]

times to remind her she was Plaintiff's first-line supervisor. [Dkt. 60-3, ¶20.] However, Plaintiff continued to communicate workplace concerns (such as scheduling and training) and seek answers to questions from other supervisors. [*Id.*]

In June 2019, Ms. Moore noted she continued having to remind Plaintiff to stop reporting work issues to Ms. Johnston rather than to Ms. Moore. [Dkt. 60-3, ¶21; Dkt. 60-7.] But Plaintiff ignored Ms. Moore's efforts to counsel her on the chain of command. [Dkt. 60-3, ¶20.] This was particularly true when Ms. Moore gave Plaintiff an answer with which she disagreed. [*Id.*] In one example, Ms. Moore denied Plaintiff's request to attend the Colorado Court Employee Conference ("Conference"). [*Id.* at ¶22.] Instead of accepting Ms. Moore's answer, Plaintiff jumped the chain of command and asked an administrative assistant whether she could attend the Conference. [*Id.*]; [Dkt. 60-8, pp.1-2.] The administrative assistant reiterated that Ms. Moore would decide who would attend the Conference. [*Id.*]; [*Id.*] Ms. Moore counseled Plaintiff on this issue and memorialized their conversation in an email to Plaintiff on July 24, 2019. [*Id.*]; [*Id.*]

Similarly, in October 2019, Plaintiff asked Ms. Moore to delete a comment Plaintiff wrote about a probationer. [*Id.* at ¶23; Dkt. 60-9.] Instead of waiting for Ms. Moore's response, Plaintiff jumped the chain of command and asked Ms. Johnston. [*Id.*]; [*Id.*] Plaintiff continued to ignore her chain of command through January 2020. During that time, she sent scheduling requests to the Chief of Probation – two levels above Ms. Moore. [Dkt. 60-3, ¶24] This required the Chief of Probation to remind

Plaintiff she needed to address scheduling issues directly with Ms. Moore. [Dkt. 60-3, ¶24;Dkt. 60-10.]

Plaintiff also struggled to adhere to her schedule. Her work schedule was Monday through Friday, 8 a.m. to 5 p.m., with a required one-hour lunch. [Dkt. 60-3, ¶27.] But Plaintiff arrived late for work, failed to take her required one-hour lunch break, or stayed late to avoid using paid time off (flexing her schedule). [*Id.* at ¶30.] Plaintiff did this without first seeking leave from Ms. Moore. [*Id.*]

Ms. Moore met with Plaintiff on August 28, 2019, to discuss the requirements for flexing her schedule. [Dkt. 60-3, ¶29; 60-13.] Ms. Moore describes Plaintiff as "combative and unreceptive to her supervisor's guidance" during that meeting. [*Id.*]; [*Id.*] The two spoke about this issue again on November 1, 2019. [Dkt. 60-3, ¶31; Dkt. 60-15.] After the meeting ended, Ms. Moore sent an email to Plaintiff confirming their conversation and providing her with an example of how Plaintiff should handle paid time off if she arrived to work late. [*Id.*]; [*Id.*] Plaintiff acknowledged receipt of the email on November 4, 2019. [*Id.*]; [*Id.*] However, Plaintiff continued to disregard the attendance policy. [Dkt. 60-3, ¶32.] Accordingly, Ms. Moore issued a Supervisory Memorandum regarding Plaintiff's violation of Judicial's flexible work schedule, which Plaintiff refused to sign. [Dkt. 60-16, p.2; Dkt. 60-2, ¶32.] Plaintiff flexed her work schedule again and without prior approval on December 10, 2019, and February 11-13, 2020. [Dkt. 60-3, ¶33; Dkt. 60-17, pp.1-2.]

Also in December 2019, Plaintiff asked a co-worker, Joy Rosales, to sign Plaintiff into the Electronic In/Out ("EIO") system in violation of Judicial's policy. [Dkt. 60-3, 35 and 36; Dkt. 60-18, pp.1-3.] Plaintiff knew this conduct violated Defendant's policy because she was trained on EIO and the Judicial Employee's Time Reporting System when she was first hired. [Dkt. 60-3, ¶35.] When Ms. Moore counseled Plaintiff on this, she became defensive, did not take responsibility for her conduct, and "threw her arms in the air exclaiming 'Ooooo, we don't want to get Miss Joy in trouble now do we? I won't be doing that anymore.'" [*Id*. at ¶36; Dkt. 60-18.]

### 3. Internal Complaint

As mentioned above, Plaintiff filed an Internal Complaint claiming her co-workers (Ms. Walton and Ms. Robertson) created a hostile work environment. The investigation, however, did not find Plaintiff was subjected to a hostile work environment. [Dkt. 76-2, p.37.] Moreover, while the Internal Complaint raised specific concerns about Plaintiff's supervisor and co-workers, Plaintiff did not mention race/color or any other protected status as the reason for the alleged hostile work environment. [Dkt. 60-24, ¶4.]

Plaintiff admits Ms. Walton, Ms. Moore, and Mr. Gray never directed racial comments to her, or made racial comments about her to anyone else. [Dk. 60-2, pp.117:8-10, 18-22, and 118:2-21.] She recalls an instance where Ms. Thurlow-Martinez informed her the reason for hostility between Ms. Moore and Ms. Johnston

is because Ms. Moore is African American while Ms. Johnston is Caucasian.[4] [*Id.* at pp.54:21- 55:20.] However, Plaintiff does not know if Ms. Johnston personally demonstrated animosity toward Plaintiff, and she denies Ms. Johnston demonstrated any animosity toward Ms. Walton, who is also African American. [*Id.* at pp.136:1-4 and 137:8-10.]

### 4. Plaintiff's Termination

Ms. Moore completed Plaintiff's performance appraisal on March 4, 2020. [Dkt. 60-3, ¶49.] Plaintiff scored a 2.75 on her performance appraisal. [Dkt. 60-19, ¶4.] Given this score, Mr. Gray decided to terminate Plaintiff's probationary employment because it was below the required 2.76. [*Id.* at ¶¶4,6.] The same day, Mr. Gray consulted with Ms. McMullin and informed her he was going to terminate Plaintiff's probationary employment based on her score. [Dkt. 60-19, ¶6; Dkt. 60-21, ¶10.] Mr. Gray and Ms. McMullin worked on the termination letter between March 4 and 17, 2020. [Dkt. 60-19, ¶8]; [Dkt. 60-21, ¶11.] On March 19, 2020, Mr. Gray, Ms. McMullin, and Ms. Moore, met with Plaintiff and terminated her employment. [Dkt. 60-19, ¶10; Dkt. 60-21, ¶12; Dkt. 60-20, pp.1-2.]

In the meantime, Plaintiff filed her first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 10, 2020 ("EEOC Charge 1"). [Dkt. 1, pp.10-13.] Plaintiff claimed discrimination based on her race and

---

[4] Plaintiff does not recall the day or month Ms. Thurlow-Martinez made this comment. [Dkt. 60-2, p.55:12-15.]

in retaliation for filing the Internal Complaint. [*Id*. at p 10.] On March 16, 2020, the EEOC issued Plaintiff a Dismissal and Notice of Rights ("Notice"). [*Id*. at p.12.] Plaintiff filed a second discrimination charge on June 30, 2020 ("EEOC Charge 2"). [Dkt. 13-1, p.1.] There she claimed her March 19, 2020 termination was in retaliation for engaging in protected activity in violation of Title VII. [*Id*.] Mr. Gray and Ms. Moore attest they made the decision to terminate Plaintiff's employment before they received notice of either EEOC Charge. [Dkt. 60-3, ¶50; Dkt.60-19, ¶13.] And Plaintiff testified in her deposition that she did not give Defendant a copy of the Notice she received from the EEOC on or about March 17 or 18, 2020. [Dkt. 60-2, pp.185:21- 24.]

## E. ANALYSIS

### 1.  Disparate Treatment Based on Race

Plaintiff sued alleging Judicial discriminated against her because of her race when it trained her differently than her white co-workers and when it terminated her employment. Judicial claims to the extent there were differences in Plaintiff's training, she has failed to show those differences were race-based or that they adversely impacted the terms and conditions of her employment. As to her termination, Judicial explains it terminated Plaintiff because she did not receive the requisite rating of 2.76 on her performance appraisal.

To survive summary judgment on a Title VII discrimination claim based on race, a plaintiff may present direct evidence of discriminatory motivation, or as here, indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973). Under that framework, a plaintiff must first "raise a genuine issue of material fact on each element of the *prima facie* case, as modified to relate to differing factual situations." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). The burden then "shifts to the employer to offer a legitimate non-discriminatory reason for its employment decision." *Id*. If the employer does so, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – *i.e.*, unworthy of belief." *Id*.

### a.   Plaintiff Fails to Demonstrate a Genuine Dispute of Material Fact on the Third and Fourth Elements of her *Prima Facie* Case Under Title VII

The Tenth Circuit has yet to determine whether the denial of training rises to the level of an adverse employment action. *But see Richardson v. Blue Cross/Blue Shield of Kan., Inc.*, 196 F. Supp.2d 1174, 1184 (D. Kan. 2002) (holding that training, although not specifically listed in 42 U.S.C. § 2000e, is considered a term or condition of employment); J*ackson v. Exxon Mobil Chem. Corp.*, No. CIV. 02-1505-HE, 2004 WL 3168283, at *9 (W.D. Okla. Jan. 16, 2004) (citing *Richardson* and assuming denial of training constitutes an adverse employment action, but finding it did not give rise to an inference of discrimination because plaintiff failed to provide evidence defendant treated her less favorably than similarly situated employees).

Here, even were the Court to assume a denial or lack of training could constitute an adverse employment action, Plaintiff has failed to come forward with

competent evidence to establish the training she received was inadequate compared to anyone similarly situated. For example, she has adduced no evidence to establish any additional training she needed or desired, the time she spent in training compared to the time any white counterparts spent in training, or that her training somehow negatively affected her performance. *See, e.g., Richardson*, 196 F. Supp.2d at 1184. And while personality conflicts between Plaintiff and Ms. Walton may have slowed her training as compared with Ms. Lombardi (who is also African American), the record indicates this deficiency did not impact her job performance. Indeed, the record indicates Plaintiff was "doing a good job," asking appropriate questions, and "her files look[ed] good." [Dkt. 76-2, ¶36.]

Plaintiff also claims she was "excluded from training" and "new hires were treated and trained differently." [Dkt. 36-2, p. 6.] But she fails to identify these individuals or present evidence that they are similarly situated. *See Rivera v. City and County of Denver*, 365 F.3d 912, 922 (10th Cir. 2004) (defining "similarly situated"). Plaintiff has failed to present any evidence similarly-situated employees outside her protected class were treated more favorably than her when it comes to the training she received. From the record, the only possible similarly-situated employee to Plaintiff is Ms. Lombardi, who is also African American and who did not experience the same personality conflicts as Plaintiff did with Ms. Walton. Even still,

Plaintiff admits the training differences between she and Ms. Lombardi were "fine" and "just a different way of doing tasks."[5] [Dkt. 60-2, pp.75:12-76:25.]

These arguments do not carry Plaintiff's burden "to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Even viewing the facts, and the inferences to be drawn therefrom, in the light most favorable to Plaintiff, the Court finds there remains no genuine issue of material fact, and summary judgment in favor of Defendant is warranted on this claim. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### b.   Even Assuming Plaintiff Could Establish a *Prima Facie* Case of Discriminatory Discharge, her Claim Still Fails for Lack of Competent Evidence of Pretext

Regarding Plaintiff's claim her termination was because of her race, Defendant provided a legitimate non-discriminatory reason for her termination. Specifically, Judicial explains it terminated Plaintiff's employment because she did not obtain the required score of 2.76 on her performance evaluation. Having offered a legitimate non-discriminatory reason for her termination, under *McDonnel Douglas,* Plaintiff must now present evidence that Defendant's reason is a pretext for discrimination. *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).

---

[5] Plaintiff's complaint alludes to two white females hired after Plaintiff that were "trained differently." [Dkt. 36-2, p.6.] However, Plaintiff fails to provide their names or present evidence that they and Plaintiff were similarly situated. To the extent Plaintiff names Joy Morales in her response, Ms. Johnston supervised her, and thus, she is not similarly situated to Plaintiff. [Dkt. 60-18, pp.1-3.]

A plaintiff may show pretext in one of the following ways: "(1) with evidence that defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness." *Drury v. BNSF Railway Co.,* 657 Fed. App'x 785, 789 -90 (10th Cir. 2016) (citing *Salguero v. City of Clovis,* 366 F.3d 1168, 1176 (10th Cir. 2004)).

Fatally, Plaintiff points to no evidence that would create a genuine issue of material fact about whether she was terminated because of her race. The record clearly establishes that probationary employees, like Plaintiff, are required to score a 2.76 to become a certified employee. [Dkt. 60-22, p.41.] Where probationary employees score 2.75 or below, they "shall be terminated." [*Id.* at pp. 41 and 42.] Ms. Moore scored Plaintiff low in the areas of communication, personal leadership/orientation to work, professionalism, and teamwork. [*See* generally, Dkt. 60-5.] These scores were based on Ms. Moore's contemporaneous notes, observations, and efforts to correct Plaintiff's deficiencies during the performance year. [Dkt. 60-3, ¶¶52 and 53.] The record also establishes Plaintiff had difficulty following the chain of command, habitually failed to adhere to her work schedule, and on at least one occasion violated Defendant's EIO sign-on policy. The record also confirms that after

Ms. Moore completed Plaintiff's performance review, she submitted it to Mr. Gray who then calculated Plaintiff's score of 2.75.

In response to this evidence of her poor performance, Plaintiff offers nothing but conclusory statements based on her subjective belief, which the Court cannot consider. *See Bones,* 366 F.3d at 875 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings."). Again, at the summary-judgment stage, Plaintiff must do more than simply argue her point-of-view or reference her beliefs; she must instead go beyond the pleadings and identify facts supported by admissible evidence. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Viewing the undisputed material facts, and the inferences therefrom, in the light most favorable to Plaintiff, no reasonable jury could find Judicial's reason for Plaintiff's termination was a pretext for race-based discrimination.

## 2. Plaintiff Fails to Demonstrate a Genuine Dispute of Material Fact on the Third and Fourth Elements of her *Prima Facie* Case for a Hostile Work Environment

To meet her *prima facie* burden with respect to her hostile work environment claim, Plaintiff must show: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (citing *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)).

Defendant concedes only that Plaintiff has established the first element of her *prima facie* case, but fails to establish the second, third, and fourth elements. [Dkt. 60, p.12.] The Court agrees Plaintiff has not established a *prima facie* case of harassment, but only as to the third and fourth elements.

Regarding whether Plaintiff was subjected to unwelcome harassment, it is apparent from the record Plaintiff did not get along with her co-worker and primary trainer, Ms. Walton. In her Internal Complaint, Plaintiff describes Ms. Walton as making her feel "excluded and ignored" as compared to Ms. Lombardi; "put down, picked on, dejected, and ridiculed in front of others" for asking questions; "verbally attack[ed];" and Ms. Walton displayed "a non-verbal attitude of negativity" during Plaintiff's first staff meeting. [Dkt. 60-23, pp.5-6.] Plaintiff asked Ms. Moore to have someone else train her because of "ongoing personality conflict [*sic*] and tension escalating" between she and Ms. Walton. [*Id.* at p. 5.] Ms. Moore said that she would speak with Ms. Walton, but "nothing changed." [*Id.*] On July 10, 2019, Ms. Moore informed Plaintiff that Ms. Walton would no longer be her trainer, and a few weeks later moved Plaintiff and Ms. Walton to the ACJC "without a supervisor being present," which meant Plaintiff was without support. [*Id.*] Plaintiff's Internal Complaint led to an investigation into the matter. In viewing this evidence in the light most favorable to Plaintiff, the Court finds she has established the second element of her *prima facie* case.

This leaves the question of whether Plaintiff has shown the unwelcome conduct was because of her race and so severe or pervasive as to alter the terms and conditions of her employment. The Court finds she has not. Again, Plaintiff offers no competent, admissible evidence to demonstrate the alleged unlawful harassment was race-based, particularly when considering the two primary harassers – Ms. Walton and Ms. Moore – share Plaintiff's protected class status. No reasonable jury could find in favor of Plaintiff on the third element of her *prima facie* case.

The same is true regarding the fourth element. The pervasive or severe standard is high. It has long been said that "Title VII does not establish a general civility code for the workplace and that a plaintiff may not predicate a hostile work environment claim on run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces." *Lounds,* 812 F.3d at 1222. (internal quotations omitted). In addition, the standard has both subjective and objective components. *Id*. It is not enough that a plaintiff deems the work environment hostile – the environment must be "so permeated with discriminatory intimidation, ridicule, and insult" that a reasonable person under the same or similar circumstances would deem it hostile. *Id*. The totality of the circumstances is the touchstone of a hostile work environment analysis. *Id*. As such, courts consider a variety of factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Sprague v. Thorn*

*Ams. Inc.*, 123 F.3d 1355, 1365 (10th Cir. 1997). No reasonable jury taking the undisputed material facts here, could find Plaintiff meets her burden.

### 3.   Retaliation

Plaintiff asserts she engaged in protected activity and was terminated in retaliation for it. Defendant argues to the extent Plaintiff engaged in protected activity, her claims fail as a matter of law because she cannot establish a *prima facie* case of retaliation. In the alternative, it argues Plaintiff's retaliation claim fails because she has failed to produce evidence demonstrating its legitimate non-discriminatory business reasons for her termination are pretextual.

To establish a *prima facie* case of retaliation, a plaintiff must show (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the employer's alleged retaliatory action to be materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Robinson v. Dean Foods Co.*, 654 F. Supp. 2d 1268, 1282–83 (D. Colo. 2009).

The parties dispute when Plaintiff first engaged in protected activity. Plaintiff claims she engaged in protected activity when she filed her Internal Complaint. Defendant asserts Plaintiff did not engage in protected activity until she filed EEOC Charge 1 on March 10, 2020. Defendant argues the Internal Complaint does not constitute protected conduct under Title VII because Plaintiff made no allegations that racial bias motivated Ms. Walton's conduct. [Dkt. 60, p.17.]

To engage in protected opposition to discrimination, a plaintiff must oppose an employment practice made unlawful by Title VII. *Dean v. Computer Sciences Corp.*, 384 Fed. App'x 831, 838 (10th Cir. 2010). Title VII makes it unlawful for an employer to discriminate against any individual because of their race. *Id*. Thus, a plaintiff's complaints regarding unfair treatment cannot be protected opposition to discrimination unless the basis for the alleged unfair treatment is some form of unlawful discrimination. *Id*. Although no magic words are required, to qualify as protected opposition the plaintiff must convey her concern that the employer has engaged in a practice made unlawful by Title VII. *Id*. (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).

Plaintiff's Internal Complaint is detailed on the Colorado Judicial Department Human Resources Division form titled "Discrimination/Harassment Complaint Form." [Dkt. 60-23, p.1.] The ensuing allegations of a hostile work environment created by Ms. Walton's unwelcome conduct, however, do not allege racial bias or motivation. Instead, Plaintiff complains generally about working in a "hostile environment," "ill treatment" she has received, and "ongoing personality conflict and tension." [*Id*. at pp.4,6, and 5.] But vague references to discrimination and harassment without any indication they are motivated by race do not constitute protected activity sufficient to support a retaliation claim. *Anderson v. Academy School Dist. 20*, 122 Fed. App'x 912, 916 (10th Cir. 2004); *see also Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002) ("To oppose plain vanilla

rude and unfair conduct . . . is not to oppose conduct 'made an unlawful practice by Title VII.'"). Moreover, the record establishes Plaintiff never mentioned race or any other unlawful discrimination in her Internal Complaint or her complaints to Ms. Moore. Accordingly, Plaintiff's Internal Complaint does not constitute protected opposition and she has failed to establish the first *prima facie* element in her retaliation claim.

Further, the record confirms that neither Ms. Moore nor Mr. Gray were aware Plaintiff filed EEOC Charge 1 until *after* they decided to terminate her employment. [Dkt. 60-3, ¶50; 60-19, ¶¶7, 13.] While EEOC Charge 1 satisfies the first element of the retaliation *prima facie* case, the undisputed material facts show no casual connection exists between Plaintiff's protected activity and her termination. *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993) ("Plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity.")  Accordingly, Plaintiff has failed to present competent evidence for a jury to infer that Defendant retaliated against her for engaging in protected activity. This is in addition to Plaintiff's failure to adduce any competent evidence of pretext, as discussed above.

### E.   CONCLUSION

Given the Court's findings, it does not consider Defendant's other arguments in support of its Motion. It is ORDERED:

1.   Defendant's Motion for Summary Judgment [Dkt. 60] is GRANTED; and

2.      Plaintiff's claims and this case are DISMISSED WITH PREJUDICE.

DATED: June 15, 2022.


                                    BY THE COURT:

                                    _____
                                    S. Kato Crews
                                    United States Magistrate Judge